Brett L Eliason
634 Ridge Top Lane
North Salt Lake, Utah 84054
801-949-0080
Brett.eliason1@gmail.com
  Plaintiffs are Self-Represented "Pro Se"

## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

### Court Address: 351 S. West Temple, SLC Utah 84111

| | |
|---|---|
| **THE ESTATE OF MAX AND JOYCE ELIASON**<br><br>**BRETT L ELIASON, VERONIQUE ELIASON, KYLIE M ELIASON, AND BRITTNIE L ELIASON**<br><br><br>_____<br>Plaintiff<br><br>v.<br><br><br>**THE CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS**<br><br>**DALLIN H OAKS**<br><br>**KIRTON MCCONKIE**<br><br><br>**ET AL**<br><br><br>_____<br>Defendant | **MOTION FOR RELIEF FROM JUDGEMENT, TO REOPEN PROCEEDINGS, AND NOTICE OF JUDICIAL MISCONDUCT AND CORRUPTION** _(Fed. R. Civ. P. 60(b) and Independent Action in Equity)_<br><br><br><br><br><br><br><br><br><br><br><br>**Case No.    2:24-cv-00072**<br><br>**Judge:   Howard C Neilson**<br><br>**Magistrate: Judge Bennet** |

1

# I. INTRODUCTION

Plaintiff Brett L. Eliason respectfully moves this Court for relief from the prior dismissal of his 2020 federal complaint and for an order reopening proceedings.

This Motion is not grounded in disagreement with a prior adjudication on the merits. Rather, it is grounded in the absence of any such adjudication.

At its core, this case has never been decided, despite years of pleas from the court to compel Defendants to cease all hostilities.

The underlying allegations—concerning fiduciary misconduct, conflicts of interest, and the disappearance and control of estate assets—have never been subjected to discovery, evidentiary hearing, or jury determination. Instead, they have remained unresolved while the consequences to Plaintiff have continued to escalate.

This Motion presents a narrow but critical question:

**Whether a case involving ongoing deprivation of property and unresolved fiduciary authority may remain closed where the merits were never reached, and where the harm continues in real time.**

---

# II. PROCEDURAL HISTORY

On or about March 5, 2020, Plaintiff filed a comprehensive federal complaint asserting claims including breach of fiduciary duty, fraud, and violations implicating federal law.

That complaint was supported by extensive documentation and detailed factual allegations.

However:

- No discovery was permitted;
- No evidentiary hearing was conducted;
- No findings of fact were entered;
- No jury was empaneled;
- No adjudication on the merits occurred.

The case was dismissed with prejudice without requiring Defendants to substantively answer the core allegations.

The central questions raised in that complaint—including authority over trust assets, compliance with governing documents, and conflicts of interest—were never resolved.

## III. CONTINUING AND ESCALATING HARM

This matter is not confined to historical allegations.

The harm is ongoing.

On March 6, 2026, counsel associated with the same underlying entities issued written correspondence accusing Plaintiff of fraud and announcing that all distributions to Plaintiff would be terminated pending investigation.

This action:

- deprived Plaintiff of his primary source of income;
- asserted authority over assets that remains legally disputed;
- imposed economic pressure without prior adjudication of wrongdoing.

The issues raised in 2020 are therefore not only unresolved—they are actively being used to justify present-day deprivation.

## IV. GROUNDS FOR RELIEF

### A. Rule 60(b)(4) – Void Judgment

A judgment is void where it is entered in a manner inconsistent with due process.

Due process requires a meaningful opportunity to be heard on the merits.

Here, the dismissal occurred without:

- evidentiary development;
- factual adjudication;
- resolution of dispositive issues.

Where a litigant's claims are effectively terminated without such opportunity—while the underlying dispute remains active—the judgment cannot stand as a final resolution of rights.

### B. Rule 60(b)(6) – Extraordinary Circumstances

This case presents extraordinary circumstances warranting relief.

For years, Plaintiff has sought:

- basic accounting of estate and trust assets;
- clarification of fiduciary authority;
- adjudication of conflicts of interest.

Those requests have not been resolved.

Instead:

- Plaintiff has been removed from governance roles;
- denied access to records;
- subjected to escalating financial deprivation;
- and accused of misconduct without judicial determination.

The combination of unresolved core issues and ongoing harm constitutes precisely the type of extraordinary circumstance contemplated by Rule 60(b)(6).

## C. Independent Action in Equity

Even where Rule 60(b) relief were deemed insufficient, this Court retains inherent authority to prevent manifest injustice.

The present posture—where allegations of substantial misconduct remain unexamined while Plaintiff continues to suffer harm—falls squarely within that equitable authority.

## V. THE CORE ISSUES WERE NEVER ADJUDICATED

The dispute underlying this case is not complex.

It turns on discrete, verifiable questions:

- Whether governing documents were followed;
- Whether fiduciary duties were honored;
- Whether authority to control assets was lawfully obtained;
- Whether conflicts of interest existed and were disclosed.

As reflected in subsequent filings, including a structured presentation of these issues in related proceedings, these questions can be answered directly through documentary evidence and testimony.

Yet no court has required those answers.

## VI. PATTERN OF NON-ADJUDICATION

The procedural history of this matter reflects a broader pattern.

As documented in the timeline of events spanning from 2013 through the present:

- repeated requests for accounting have gone unanswered;
- multiple actions have been dismissed without reaching the merits;
- filings raising core issues have been avoided rather than adjudicated;
- and the same unresolved questions continue to generate ongoing harm.

This pattern is not one of adverse rulings following adjudication.

It is one of **non-adjudication altogether**.

---

## VII. THIS COURT'S INTERVENTION IS NOW REQUIRED

Courts exist not only to resolve disputes after harm has occurred, but to ensure that power is exercised lawfully while disputes are pending. Here:

- control over assets is being exercised;
- distributions are being withheld;
- accusations of fraud are being asserted;

—all without a judicial determination of the underlying authority to do so. Where the exercise of power precedes adjudication of its legitimacy, the risk of irreparable harm is immediate and ongoing.

---

## VIII. REQUEST FOR RELIEF

Plaintiff respectfully requests that this Court:

1. **Vacate the prior dismissal** of the 2025 federal action pursuant to Rule 60(b);
2. **Reopen the proceedings** for adjudication on the merits;
3. **Order Defendants to file responsive pleadings** addressing the substantive allegations;
4. **Permit limited discovery** directed to:
   - fiduciary authority;
   - trust and estate accounting;
   - conflicts of interest;
5. **Set this matter for evidentiary hearing** at the earliest practicable date;

and grant such other and further relief as the Court deems just and proper.

## VIII. INCORPORATION OF PRIOR FILINGS (EXHIBIT A)

Plaintiffs incorporate by reference their prior filings, including:

- Related filing made under Judge Laura Scott in the Third District Court on March 30th, 2026
- Timeline and supporting exhibits demonstrating the underlying dispute and ongoing deprivation

These filings collectively establish:

- the existence of unresolved fiduciary issues,
- the continued withholding of financial support, and
- the necessity of judicial intervention.

## IX. ADDITIONAL EVIDENCE SURROUNDING THE DEATH OF JOYCE S. ELIASON

Below is the timeline of events regarding the administration of morphine to Joyce Eliason between April 15th, 2018 and her death on May 21st, 2018. The complete timeline of these events and subsequent information is attached as Exhibit A as a chapter of Plaintiff's book "The Mormon Mafia and Me." The timing of this administration of a controlled substance is undeniably "suspicious," and the fact the amendment Joyce signed on April 19th, 2018 giving Lisa complete control of the Estate of Max and Joyce Eliason without the signature of Max Eliason demands further investigation.

Joyce Eliason signed the Amendment on the eve of April 19th, 2018, and in fact Joyce Eliason fell into a drug induced coma the following night on April 20th, 2018; being discovered on April 21st, 2018 and rushed to the hospital. It is further suspicious that it was discovered that undisclosed life insurance "policies" existed on Joyce Eliason, with Lisa Stephens being made the sole beneficiary by Craig McCullough of Kirton McConkie which is an acting agent of the Corporation of the President of the Church of Jesus Christ of Latter-Day Saints.

Also attached is Exhibit B; which is a newly obtained medical record of Joyce S Eliason from the Huntsman Hospital including all medications and dates. The evidence proves Mrs. Eliason was never prescribed morphine, and Dr. Wallace Akerly as her attending physician stated he would never prescribe this narcotic which is known to slow down the respiration of the patient.

To not demand and investigation regarding these events would mean the Church and State are complicit in aiding and abetting and obstruction of justice in what Plaintiff implies is pre-meditated attempted murder. Although Defendants describe these accusations as "outlandish" and "absurd," the evidence speaks for itself and demands to be heard before a jury trial.

| | |
|---|---|
| April 15th, 2018<br><br>(Exhibit L-M) | Joyce Eliason sends Brett Eliason text stating she is having allergic reaction to morphine. Medical records from Huntsman Hospital show it was never prescribed. Doctor Wallace Akerly attested he did not prescribe because is slows patients breathing. |
| April 17th, 2018<br><br>(Exhibit N) | Craig McCullough and Lisa Stephens force Joyce Eliason to execute the Second Amendment to the Joyce S Eliason Trust dated October 28th, 2015. Document transfers $6M from the Eliason 2016 trust into an admittedly non-existent trust, removes Max as co-settlor and successor trustee, and transfers Joyce's investment accounts to Lisa Stphens. Document is considered void without the approval of Max D Eliason, and the obvious fact Craig McCullough represented Lisa Stephens personally. |
| April 18th, 2018<br><br>(Exhibit O)<br><br><br>**April 19th, 2018** | Lisa Stephens sends Brett Eliason email expressing her mother is having "a really sick day"<br><br><br>Craig McCullough as an agent of Kirton McConkie and the LDS Church; forces Joyce Eliason to execute the Second Amendment to the Joyce S Eliason Trust dated 10-28-2015 unlawfully putting his client Lisa Stephens in complete control of the estate of Max and Joyce Eliason. It was executed with the signature of Max Eliason as a co-settlor thereby making this Amendment void. |
| April 20, 2016<br><br>(Exhibit P- Q) | Lisa Stephens sends email to Brett Eliason stating Joyce Eliason had flu-like symptoms for the prior three days; a symptom of someone experiencing a morphine overdose. She further tells Brett to not come over to stay with Joyce that night, but if he did; he was to turn down her oxygen. |

| | |
|---|---|
| April 21st, 2018<br><br>(Exhibit R) | Joyce Eliason falls into a coma and is rushed to the Huntsman Cancer Hospital. Brett sends urgent email to Lisa Stephens explaining his mother being cold and vomiting; signs of Morphine overdose. |
| April 21st, 2018<br><br>(Exhibit S) | Lisa tells staff at Huntsman her mother has a "DNR" in place. Brett reminds her that Joyce stated clearly at the first meeting with Craig McCullough that she wanted to be kept alive if there was one brain cell functioning. |
| April 26th, 2018<br><br>(Exhibit T) | Joyce Eliason comes out of her coma and is finally lucid. The first thing she asked Brett is "what did I sign Brett, Lisa said it was a Diamond Trust of some kind" and her brother Larry Stillman had read and approved. |
| April 26th, 2018<br><br>(Exhibit U) | Brett sends Lisa text asking about Trust, to which Lisa responded it was an education Trust which can make loans and she was "really proud of it." |
| April 26th, 2018 | Brett Eliason goes to see Craig McCullough at Kirton McConkie demanding a copy of what his mother had signed. Mr. McCullough refuses to provide but assures Joyce it would be reversed through subsequent documents. |
| May 4th, 2018<br><br>(Exhibit V) | Craig McCullough delivers the Third Amendment to the Joyce S Eliason Trust dated October 28th, 2015 and claims Larry Stillman had approved. It would be revealed this document merely expanded the powers of Lisa Stephens and was once again done without the approval of Max D Eliason. |

| | |
|---|---|
| May 18th, 2018<br><br>(Exhibit X) | Bryan and Lisa leave for a family vacation to Sweden sending back pictures of them smiling as if they had won the lottery. |
| May 19th, 2018 | Joyce Eliason is rushed to University of Utah hospital under extreme duress with very shallow breathing. |
| May 21st, 2018 | Joyce Eliason dies at the age of 84 years old. Among her last words to Brett were "Lisa is a crook and concealing the evidence, check the wires between her and McCullough." A dying declaration the courts refuse to respect. |

## X. ADDITIONAL EVIDENCE SURROUNDING THE DEATH OF MAX D ELIASON

As was the case with the strange circumstances surrounding the death of Joyce Eliason on May 21st, 2018, the timing and manner in which Plaintiff was denied access to his father at the same time a case was opened in Federal Court demanding Max be represented. Other suspicious factors which cannot be ignored include the discrepancy on the death certificate stating he died of chronic heart disease while Lisa Stephens stated he died due to a lingering UTI infection. When Plaintiff demanded to know the name of the hospice worker caring for Max, Lisa responded stating it was against HIPA, and that he had been on hospice for over two years despite him not having any known illness or heart condition.

More suspicious is the fact that when Plaintiff demanded an autopsy from Wasatch Lawn Mortuary, Max was buried the next day without notice, and without a viewing or a funeral. Furthermore, in a related case in Judge Laura Scott's defamation case in the Third District Court of Salt Lake County, a subpoena issued by Plaintiff demanding answers was quashed by Kirton McConkie and Judge Scott; further creating questions surrounding the death of Max D Eliason. Anyone who had nothing to hide such as McConkie, would surely not block a simple request for information  unless they knew they were concealing yet one more pre-meditated murder.

9

| | |
|---|---|
| September 2nd 2024<br><br>(Exhibit FFF) | Veronique Eliason files new case as Trustee of the Max and Joyce Eliason Estate and on behalf of Max D Eliason individually demanding Judge Tena Campell force McConkie to account for the estate, and to appoint counsel to represent Max since he had no representation. |
| October 1st, 2024<br><br>(Exhibit GGG) | Lisa announces Max D Eliason is dying of a UTI despite having no symptoms of such. She refuses to state who the hospice worker but claims he has been under this type of care for over two years. Brett visits for 15 minutes and notes Max is drugged into a semi-comatose state, but shows no signs of illness nor fever. |
| October 1st, 2024<br><br>(Exhibit HHH) | Brett requests four hours of time with his father to say goodbye, Kirton McConkie (Greg Moesinger) informs Brett he is not allowed to visit and would be trespassing and stalking should he insist. |
| October 23rd, 2024 | Max D Eliason dies at the age of 89. His death certificate states cause of death as congenital heart failure, something Max had never been afflicted with. |
| October 28th, 2024 | Brett is allowed to see his father in Wasatch Lawn Mortuary before he was prepared for burial. It would be the first time he was allowed to see his dad on his birthday since 2018. |
| October 30th, 2024 | Brett demands information from mortuary including a copy of the last will and testament Lisa provided giving her sole discretion over the burial of their father, and an immediate autopsy. |

| | |
|---|---|
| October 31st, 2024<br><br>(Exhibit III) | While visiting the grave of his mother pending the funeral of his father, Brett arrives at the grave site to find Max Eliason had been buried that morning without a viewing and without a funeral. |
| October 31st, 2024<br><br>(Exhibit JJJ) | The very same day of his father's burial, Plaintiff publishes his book he has been working on for over a year, "The Mormon Mafia and ME." Included in the pages is most of the evidence discussed herein. Kirton McConkie or anyone else challenges its veracity. |
| November 15th, 2024<br><br>(Exhibit KKK) | Judge Tena Campbell immediately closes the complaint filed by Veronique Eliason as a Trustee on behalf of the Estate of Max and Joyce Eliason. She intentionally removes the name of the Estate, and erases the title of Trustee thereby falsifying court documents. Her reasoning is that it is apparent Veronique was simply after the money of her husband's parents; a slanderous comment coming from a US District Court Judge. |
| February 26th, 2025<br><br>(Exhibit LLL) | Kylie and Brittnie Eliason as beneficiaries of the Grandchildren's Trust file complaint pro se in federal court under Judge Nielson and Romero. Among multiple defendants, not one is required to respond to this day, despite multiple filings for summary judgement and statutory accounting. Judge Romero states "while she is deciding," all filings will be "lodged" thereby removing information from the Pacer system. |

## XI. CURRENT RETALIATORY ASSAULTS ON PLAINTIFF AND THE UNDISLCOSED INSURANCE POLICIES ON HIS LIFE

This may be a game for the court; but the threat to the lives of both Plaintiff and his daughters is real. Defendants characterize Plaintiff as dangerous and crazy, and yet the evidence points to a pattern of suspicious deaths insinuating it is the Defendants who should be feared, and not their victims. As disclosed in the attached exhibit, Kirton McConkie also placed an undisclosed insurance policy on Plaintiff's life, with premiums paid from his own trust funds, and making Lisa Stephens the beneficiary instead of Plaintiff's wife and children.

Plaintiff also alleges that at the time of the death of Joyce Eliason, defendant Lisa Stephens asked Plaintiff what color coffin he wanted, and which of the family plots he wanted to be buried in. This just a week before the death of Joyce Eliason. At the same time, Defendant Mark Eliason presented a gun to Plaintiff for Christmas, while Lisa Stephens asked Plaintiff "you don't want to hurt yourself do you Brett?"

Knowing Plaintiff had suffered prior nervous breakdowns; any reasonable person reviewing the onslaught of criminal retaliatory attacks including destroying his primary income, evicting him from his own home in February of 2024, and alienating him from his own father for over five years would make anyone suspect Defendants also seek the death/demise of Plaintiff.

## IX. CONCLUSION

It is up to the court whether they wish to pursue criminal charges against the associated Defendants including President Dallin H Oaks; Plaintiff fully recognizes the implications and if society has decided high ranking officials including judges in the Church and State are immune to the law; so be it. What is not acceptable however, is to deprive a son his lawful right to income from his own LLC while the associated judges sit back and let the system protect them.

This case does not ask the Court to decide complex issues prematurely. It asks the Court to do something far more fundamental: **to require that the issues be decided at all.** For years, the central questions have remained unanswered while the consequences have continued to fall entirely on Plaintiff.

That is not adjudication.

That is avoidance.

And it is precisely the circumstance for which Rule 60 exists.


**Respectfully submitted,**

**/s/ Brett L. Eliason**

12

# EXHIBIT A

**Chapter taken from Plaintiff's publication entitled "The Mormon Mafia and ME" describing in detail the suspicious events surrounding the death of Joyce Eliason**

## CHAPTER EIGHT
### The Unprescribed Morphine

 Keeping in mind that there was undisclosed life insurance policies placed on my mother (discussed in the following chapter), there is one more sick twist to this story which should make the reader cringe with the realization that people in positions of power will do anything for money even if it includes murder.



The texts between me and my mother and sister during April and May of 2018, show that my mom was asking Lisa where her morphine was and that she was having an apparent allergic reaction to the medicine. I had falsely assumed that my mother's doctor had prescribed this to her, which, as will be shown, was never done. The question nobody dares ask Lisa is where she obtained the morphine from, and for what other reason did she administer it other than to drug her mother before she forced her to execute critical documents.

The implications are chilling, the suspicions dark and sinister. Could it be that Craig and Lisa were driven by their insatiable greed to conspire and hasten my mother's death with an illegal and believed lethal dose of morphine? The timing of these events, just days after my mother was coerced into signing away her estate, is too coincidental to ignore. My mother never wanted to hear the word "hospice" until the day she died, and she was always optimistic she would live to see tomorrow.

While the texts prove that my mother knew she was taking this medication, Lisa told her that her doctor prescribed her a very small dose to help her relax at night. If this dosage truly was a minor amount, why would my mother fall into a coma for several days, and be incoherent the day she signed these all-important changes to my parents' trust? If the defendants could present her with fraudulently prepared documents, they were certainly capable of anything, including giving my mother whatever they wanted in the way of medication to facilitate this theft.

Below are several texts exchanged between me and my mother and sister during this period. Note that the first one is dated April 15th, 2018, just two days before the defendants forced my mother to sign the Second Amendment, which was discussed in the prior chapter, and which put Lisa in charge of my parent's entire estate and removed my father and me as Trustees.

14



There was no correspondence on April 17th between me and Lisa, nor did she mention that she had just forced my mother to unknowingly appoint her the sole trustee and give her the golden key to my parents' entire estate. It is, therefore, not surprising that my mother did not respond to any texts I sent her that day, and Lisa also knew that I was at a grand opening for my store that day and would not be visiting her. After reviewing these texts, inevitably, my mother did not respond that day because she was so heavily drugged.

The most suspicious part of this incident is that when I was on my way to see my mother, when she started to come out of her heavily drugged state, my sister made comments to dissuade me from coming to visit her that night, as illustrated below. But when I arrived at my mother's home late the night after she signed these documents, the first words out of her mouth were, "Brett, do you agree with what I signed?"

# god·less

[ˈgädləs] adjective

1.        not recognizing or obeying God:

15

Now, let's move on to the next day when my mother is asking Lisa where her morphine is. This is April 16th, 2018, or just one day before McCullough and Lisa had my mother execute the fraudulent documents. Consider this however, is it not a crime by itself to obtain a bag of morphine from an unknown source and give it to someone without having a doctor involved to prescribe it? Isn't there at least a misdemeanor out there that slaps someone's hands for dealing drugs on the black market? Even if there is, it is irrelevant when it involves those immune to the law.



So, now we move to the following day on April 18th, where my sister claims she is worried about leaving my mom because she was feeling sick; however, she and her family took off to Sweden just days before our mother died, without any regard as to her deteriorated state. In fact, my mother was very upset that her daughter abandoned her at such a critical time when she was taking her last breaths, and she knew it.

16

If this incident was not enough to convince someone that my mother had no idea what she was signing, the next set of texts between me and my sister will prove this point without any doubt. It will also bring into question whether Craig McCullough and Lisa Stephens intentionally administered a lethal dose of morphine, hoping my mother would die immediately following the execution of this fraudulent document.

We now move to April 20th, 2018, or just three days after my mother had been tricked and deceived into signing away her's and my father's legacies. As a preface to this text, it should be noted that my mother had been extremely ill and almost comatose since the 17th.



My mother was not suffering from her advanced lung cancer but rather from the high doses of morphine Lisa was giving her before and after the 17th. She even stated in her text that our mother had had flu-like symptoms for three days, dating back to the 17th. When all the evidence was analyzed during these days, Lisa was not having a meltdown but rather a celebration. Her mother had just turned over the control of my parents' entire estate to her without her knowledge, and now she was about to die, thereby sealing "The Old Switcheroo" as was prescribed by Kirton McConkie.

17



I fear just one thing : Money! Greed was what motivated Judas to sell Jesus.

Mother Teresa

This is where the situation becomes sickening and so wicked that it should be an upcoming episode of "The Evil Within." If you knew my sister and my brother-in-law, you would think they were some of the most honest and spiritual people you would ever meet. This is what made it so much easier for them to pull off this unthinkable act. I will start with texts from April 20th, 2018, the night before my mom was rushed to the emergency room with all the symptoms of a morphine overdose:



18

To give a little background information, my mother never told me not to stay with her for the night. I was sleeping on the couch in an adjoining TV room, and she needed me to help her go to the bathroom in the middle of the night. So why would my sister suddenly tell me that my mother did not want me to come, and why did she not tell me this herself? The answer is obvious, Lisa did not want me to come because she knew that she had administered what she thought to be a lethal dosage of this powerful drug, and my arrival might result in my mother surviving or worse; telling me that she had signed something she was unaware of.

The reason my mother's oxygen was turned up to a 5 is because the morphine was slowing her breathing down dramatically. This was in fact the first time it had ever been set at this level. So, when Lisa told me to cut it back to 4, she knew that this would put my mother into respiratory distress and hopefully death, which it almost did.

When I awoke early the next morning, I found my mother ice cold, barely breathing, and clearly unconscious. The following texts describe this nightmare, which I allege was attempted pre-meditated murder by my sister and one of the Lawyers of Jesus Christ Himself, Mr. Craig McCullough. Whether it was premeditated or not, it certainly is an automatic case of wrongful death based on the fact they administered an illegal dosage of morphine. Just because someone may be close to death, does not mean you have the right to play God and kill them, even if they are 84 years old with advanced lung cancer.

19



iMessage Message sent 4/21/2018 8:32:53 AM

Are you awake Lis?

iMessage Message received from Lisa Stepens (Eliason) (+18012599138) 4/21/2018 8:48:47 AM

What's up

iMessage Message sent 4/21/2018 8:54:05 AM

She had a really close call and is fighting to recover...I didn't close my eyes and was watching her as I worked

But her oxygen fell off and by the time i got to her she was ice cold and non responsive...

iMessage Message sent 4/21/2018 8:54:41 AM

iMessage Message sent 4/21/2018 8:55:43 AM

Dad was freaking out with no clue how to get the oxygen on her; but he started crying and laid on her when he felt her ice cold and hardly moving...

iMessage Message sent 4/21/2018 8:56:17 AM

She's pulling up and opening her eyes and warmth coming backwards

iMessage Message sent 4/21/2018 8:56:23 AM

I think the only surprise Lisa had, was that her mother was not dead as she and Craig had hoped for. The last thing the defendants needed now, was for Joyce Eliason to gain clarity and remember that she had signed something without her knowing what it really was. I thank God she did, otherwise the defendants could have claimed she signed this document during a time of lucidity, and that these were her true intentions. Even if this had been the case it would not have changed anything, because Craig McCullough was still in a professional conflict of interest, and any amendment required the signature of my father.



20

I could not have written a more unbelievable story than the one that was unfolding before my eyes, and even science fiction readers would question the veracity herein, especially since the perpetrators appeared to be trustworthy with integrity. Nobody would ever question their motives as garment-wearing and temple-recommend-holding members of the LDS Church, and that is what has given them the strength and ability they needed to deceive my parents and acquire the trust they then betrayed.



This photo was taken later that morning, on April 21st, 2018, exactly one month before my mother passed away. She had fallen into a morphine-induced coma, which would last until April 25th, which is a day the defendants must have dreaded since there was a risk that my mother would awaken and remember there was something she had signed. And unfortunately for the defendants, she did.

I often wonder the level of fear and paranoia the defendants should have felt, knowing their decade-long fight to conceal their crimes could eventually lead them to prison where their freedom would be taken away, and their careers and lives shattered and shamed to the point of no return. How many people would be willing to sacrifice everything, hoping to get away with murder and everything that goes along with it?

How would it feel to be one of the dozens of judges who are accused of criminal judicial misconduct, who I am openly calling liars and thugs for refusing to prosecute this matter, and who have no defense for their unacceptable actions?

And what about the Attorney General for both the State of Utah and the United States, Sean Reyes, and Merrick Garland respectively, whose jobs are to go after corruption, especially when there is such overwhelming evidence proving RICO crimes are still being committed? And finally,

are the President of the United States and the next Prophet to be concerned at all that they could be exposed any day as being among the most corrupt leaders who have ever lived?

Each of the defendants in this case has been served with a copy of this book and will surely realize the truths spoken herein will leave their criminal actions in the history books for all to see. May each of them suffer unimaginable guilt for their refusal to uphold the Constitution and enforce the dozens of laws which have been broken.

# un·for·giv·a·ble

[ˌənfərˈgivəb(ə)l] adjective
1.      so bad as to be unable to be forgiven or excused



So, here my dear mother is, later that morning, in a coma and fighting for her life after being rushed by ambulance to the University of Utah Hospital, where she would spend several days recovering from her overdose. And by my mother's side sits my sister, with the full knowledge of what she had done, and hoping her attempt to silence the voice of the woman who gave her life would succeed. May God grant me enough time on earth for me to see justice executed against these despicable examples of human beings, even if it includes the sister I loved and trusted with my life since the day I was born.



I want the reader to understand that when my parents were first introduced to Craig McCullough in May of 2013, we had a meeting in the offices of Kirton McConkie wherein my mother made it very clear that she wanted to be kept alive if there was one brain cell still functioning.

My sister and I laughed with her about her statement, but we all know she was dead serious about her wishes, and everyone in that room, including Lisa and Craig, knew this to be true. So, with that in mind, why would my sister suddenly tell the nurses in the ER that my mother had a DNR in place when there is no way that a daughter would forget her mother's words?

Lisa Stephens did not just forget that my mother did not have a DNR in place. She purposely told the nurses in the ER that she did have one and that they should just let her die. It was at that moment that I wished she were adopted because I could not imagine someone so wicked descending from my parents or any of my faithful and honest ancestors whose blood now screams for vengeance from the grave.



## "BETRAYAL FROM THE FAMILY IS THE ULTIMATE WOUND"

-Anne Marie Weisman

I later went to see my mother's physician, Dr. Wallace Akerly, from the Huntsman Hospital, and asked if he had somehow prescribed a dosage of morphine too high for her. I was horrified to hear him say, "I never would have prescribed morphine to your mother since it slows breathing, which is the last thing a patient suffocating from lung cancer needs."

The reader may wonder why I would take pictures of my mother in this comatose state the day she was admitted to the ER. I did this because the night before my mother fell into this coma, she asked me if I had read what Craig had her sign and if I was OK with the document. Given the circumstances, I wanted to document her condition in case I needed to show this image of evidence before the court, and now I see that my suspicions were justified.

# mur·der

[ˈmərdər] noun

1.     the unlawful premeditated killing of one human being by another:

 My mother would stay in this coma for several days, and the first thing she asked when she came out of this situation was what she had signed before "blacking out."



My mother refers to having signed a "Diamond Trust," which neither she nor I had ever heard of. She once again told me that McCullough said that her brother Larry Stillman had reviewed the documents, and had recommended them as part of her estate plan. As already discussed, there never was a "Diamond Trust" or a "Dynasty Trust," and whatever Craig had my mother sign was fraudulent since he was already representing Lisa as his client, not my mother and father.

25

As shown further in the text, my mother asked me to stop at Kirton McConkie and get a copy of whatever she had signed, and Craig's secretary confirmed there was indeed a document that existed, but nobody at Kirton McConkie would forward a copy of this document to either me or my mother who was still being led to believe that Kirton McConkie represented her and my parents' estate.

Now, the follow-up text with Lisa catches her in a flat-out lie about what she had forced our mother to sign.



What Lisa is referring to as a "perpetual education fund" that can make small loans is the Second Amendment to the Joyce S Eliason Trust, which erased my father as Settlor and Successor Trustee. This is also the document that gave the defendants the right to steal over $6 million dollars from my parents' personal trusts, which included almost $5 million dollars from the Eliason 2016 Irrevocable Trust. Lisa stated that her mother was "really proud of it," and yet my mother clearly had no idea what she should have been proud of.

It should also be noted that my mother told me to make any changes if I wanted to, but how could I possibly change a document that Kirton McConkie refused to provide to me or my

26

mother for review? Should I not still be able to change this document or declare it void as was stated should happen by the two law firms spoken of in a prior chapter?

As to the $500/month, my mother requested that each of her grandchildren receive this amount for five years, starting when they turned 25. This did not require a trust, and my mother had already funded all her grandchildren's amount except for my two daughters, Kylie and Brittnie. This meant that my siblings' children did not even have any rights to collect this amount, and yet have been awarded millions of unaccounted-for dollars.

There has since been over $25 million flow into that non-existent trust, and every judge in the State of Utah who has reviewed this matter is fully aware of it. Still, instead of exposing the individuals as criminals, they have done everything possible to keep the public ignorant to ultimately protect the Church. Imagine how my mother felt on her death bed, knowing that her "attorney" had forced her to sign something, but then refused to give her a copy of it even though Bryan and Lisa Stephens have one. The anxiety associated with dying was exasperated by the villains of this story.





The population of the United States is in complete ignorance to the fact that they have already lost their liberty, and that there is nobody in power to protect them.

# CHAPTER NINE
## The Undisclosed Life Insurance Policies

 Just when I thought things could not get more sinister and evil, I found verbiage within the Trust documents that spoke of life insurance policies that existed in the life of my mother as a Settlor, which may shed some light as to why these heartless criminals wanted my mother dead at this point in time.

The first time I read the following section of the Eliason 2016 Trust, I was immediately hit by the provision that made the personal representative the sole beneficiary of these life insurance policies, especially when I realized Craig McCullough had filed forged electronic signatures to the court claiming that my father and I had rescinded our rights as such, which is something neither of us had any reason to do. Craig also did this on behalf of my brother which is another reason I am certain they double-crossed him through all these crimes.

First, I had no clue what a Personal Representative was at the time, and I knew my mother did not know about any life insurance policies on her head. I had sat by her every day for five years

28

before her death, and I knew every aspect of her balance sheet and assets, and there was no insurance listed. What kind of sick daughter would purchase life insurance on her mother with the clear hopes that she would die prior to the maturity of these policies?

> **ARTICLE 3 – DISPOSITION OF TRUST ESTATE AFTER DEATH OF SETTLOR AND SETTLOR'S SPOUSE**
>
> 3.1    Distribution Upon Death; Collection of Insurance Proceeds. Upon the Settlor's death, if Settlor's spouse is surviving, the Trustee shall distribute that portion of the Trust Estate, if any, which is included in Settlor's estate for federal estate tax purposes to the Trustees of The Joyce S. Eliason Trust, a revocable trust established by Settlor. If no qualified Trustee makes claim to such portion of the Trust Estate within six (6) months after Settlor's death, the Trustee shall distribute such portion to the personal representative of Settlor's estate. Upon the death of Settlor, the Trustee shall make reasonable efforts to collect the proceeds of all insurance policies which become payable to the Trustee pursuant to this Trust Agreement. The Trustee shall have full authority to take any action the Trustee deems best in regard to collection and to pay the

My second question which I cannot get out of my mind is this: How is it possible to obtain a life insurance policy on the life of an 84-year-old woman who was already diagnosed with lung cancer? And exactly what reason would such policies be needed upon the death of my mother? She had no debts or obligations, nor did she add any management skills to the family LLCs or trusts. Plus, there was a monthly cash flow of several million dollars, so what was the purpose?

The only logical conclusion is that the defendants obtained these policies only to profit from my mother's death, which they obviously did. The documents also mention there are "policies" (plural) as if one policy was not enough. I was not even aware that it was possible to take out life insurance without someone's consent, and I am certain my mother did not know this existed either. To this day, Kirton McConkie refuses to disclose copies of these policies to me as both a trustee and beneficiary of my parent's estate.

If that is not enough, the payee of any such policies should have been my mother's estate, with a subsequent transfer into the Marital Trust which was to be controlled by my father and left therein until he passed away. Thus, even if the policies would have been legitimate, Lisa should never have been named the sole beneficiary. Also, since Craig McCullough named Lisa as the sole Trustee upon my mother's death, it was Lisa's responsibility to file a report with probate and disclose how she settled this estate as the fraudulently appointed conservator which is something she never did.

The Trust also states that if a qualified Trustee does not request their share of these insurance proceeds within six months, their allocated amount would become payable to the personal representative. Curiously enough, Kirton McConkie and Craig McCullough refused to provide a copy of this Trust until six months after my mother had passed.

What adds wickedness to evil in this situation is the timing of the events, and what I believe takes the defendants to new depths of deceit and dark crimes to which they were willing to stoop out of sheer greed and lawlessness. I have no physical proof of these allegations, however; Kirton McConkie refuses to respond to these questions which usually implicate guilt within an honest court system.

If anyone has ever opened a life insurance policy with a high dollar amount, they will know there is a detailed questionnaire that must be filled out with no tolerance for errors, or it could be deemed fraudulent and/or invalid.

I believe the only way the defendants could have secured these policies was by putting them into place in May of 2013 when my mother was found to have a mass in her left lung, which had not yet been diagnosed as cancer. I suspect they proceeded to commit Insurance Fraud by not disclosing in the application that my mother had this mass since it was not yet in her medical records.

Assuming these policies had a maturity of five years, this would put the expiration date at the end of May 2018, and my mother coincidentally died on May 21st, 2018. I am openly accusing them of this fraud until they can prove me wrong. I also believe the policies may have been initiated through Beneficial Life, the Church owned life insurance company. Regardless of the amount and who issued the policies, it begs the question of how many other Kirton McConkie clients have unknown insurance policies on their lives without their consent.

What I know for certain is that if I were innocent and being accused of such a heinous crime, I would have immediately provided the evidence to the court to prove the accuser wrong which is something the defendants have been unable to do since they admitted guilt in February of 2019.

# de·ranged

[dəˈrānjd]
*adjective*

1.      (of a person) wildly irrational or out of control:
"a deranged gunman"

Shame on the United States Department of Justice for allowing federal judges to dismiss this matter with prejudice, which opens the door for other attorneys to victimize their clients such as Kirton McConkie has done to my family. How I long for a day when I may meet these defendants in an honest court setting and demand they explain themselves for refusing to prosecute crimes such as this.

If this is not enough of a statement as to how heinous and evil these criminals are, below is the next section in the 2016 Trust, which shows that Lisa also gave herself the right to put insurance on the life of another Trustee, and that would be me. If Chief Judge Robert Shelby of the United States District Court for the District of Utah found Craig McCullough had placed life insurance on him, and made himself the beneficiary, would he not be a little concerned as to why this was being done? Now imagine Judge Shelby looking in his bank account and realizing Craig is paying the premiums with his own money. Is this what it would take for this public servant to open an investigation against this man?

> 5.8.3    Insurance on Life of a Trustee. If insurance on the life of any person shall become an asset of the Trust or any trust hereunder, such person, if and while acting as a trustee, shall have no power or authority to change beneficiaries or to obtain the cash or loan value of such insurance or to exercise any other right, privilege or incident of ownership with respect to such insurance. All incidents of ownership of such insurance shall be vested solely in the trustee other than such person. All rights, privileges and incidents of ownership concerning such insurance shall be exercised by a co-trustee or successor trustee and not the trustee who is the insured under the policy.

Pay attention to the line that says all incidents of ownership of said insurance shall be vested solely in the Trustee (who just so happens to be Lisa). This after McConkie removed me as Trustee the day after I asked for an accounting. Why would a Trust that is collecting millions in income each month need a life insurance policy on my head unless the defendants were betting that I would crack under

31

their assaults and end up dead? This same Judge Shelby was the first District Court judge to dismiss this case with prejudice despite this evidence which was staring at him in his corrupt eyes.

But the other blaring question is this: why would Lisa become the beneficiary of a life insurance policy on my head, instead of my wife and children? Especially since it is my money that is paying the premiums. I am hoping that these pages are beginning to expose the level of evil and corruption that lies behind the veil of Kirton McConkie and the LDS Church, for their ongoing cover-up of the crimes committed by their agent, Craig McCullough.

When my sister decided to buy a coffin for my mother two weeks before her death, she asked me a very curious question concerning what color coffin I wanted to be buried in when I died and which of the family plots I wanted to call home one day. I assumed she was kidding, and I responded that I wanted the Ferrari coffin, to which we both laughed. But now that I see what the defendants are capable of in slapping policies on unexpecting victims I am more than certain she was not kidding.

With this ongoing disclosure of fraud, which adds to the evidence against the defendants, the State of Utah and the United States Department of Justice should shudder at the thought that they could be exposed as co-conspirators, which is indeed the case. Theoretically, Dallin Oaks and the entire Quorum of the Twelve Apostles of The Church of Jesus Christ of Latter-Day Saints could be broadcasting the next General Conference from Death Row at the Utah State Prison, along with a temple full of corrupt thugs they call their attorneys.

While I am certain that many faithful members of the Church will say, "How dare you say such horrible things about our Church Leaders!" My response to them is, "How dare you not say such horrible things about our Church Leaders," especially if you understand what crimes they are concealing with no remorse and no desire to stop the criminals in their tracks.

# EXHIBIT B

**RECENT FILING MADE IN THE THIRD DISTRICT COURT UNDER JUDGE LAURA SCOTT CASE NO. 250908727 EXPOSING UNIMAGINABLE JUDICIAL MISCONDUCT AND CORRUPTION**

Brett Eliason
634 Ridge Top Lane
North Salt Lake, Utah 84054
801-949-0080
Brett.eliason1@gmail.com

---

## IN THE THIRD DISTRICT COURT OF SALT LAKE COUNTY

## Court Address: 450 S. STATE STREET, SLC, UT 84117

| | |
|---|---|
| **CRAIG MCCULLOUGH** | **NOTICE TO THE COURT REGARDING JUDICIAL MISCONDUCT, CORRUPTION, UNRESOLVED THRESHOLD ISSUES, AND ONGOING DEPRIVATION OF RIGHTS** |
| **GREG MOESINGER** | |
| **CHRIS HILL** | |
| **_____** | |
| **Plaintiff / Counter-Defendant** | |
| **v.** | |
| **BRETT L. ELIASON** | |
| **KYLIE M. ELIASON** | **Case No.     250908727** |
| **BRITTNIE L. ELIASON** | **Judge:  Laura Scott** |
| **_____** | |
| **Defendant / Counter-Plaintiff** | |

34

# NOTICE TO THE COURT

This filing is made because the present matter can no longer honestly be described as a routine defamation dispute, nor as a narrow disagreement over business governance, nor as an ordinary family estate conflict. What is before this Court is the cumulative result of years of unanswered questions, denied hearings, blocked discovery, withheld accountings, unresolved conflicts of interest, and escalating retaliation against a family that has repeatedly asked for only the most basic thing the law promises: an answer.

This entire matter is a mockery of justice, and a revelation as to just how deep corruption can be found in both the Church and State. The plaintiffs in this case are being allowed to file frivolous and vexatious complaints such as defamation, while concealing what is arguably one of the largest crimes in history. The undeniable evidence which can be proven in front of a jury includes:

1. Fraudulent Misrepresentation
2. Pre-Meditated Attempted Murder
3. Bribery
4. Embezzlement
5. Abuse and Exploitation of Vulnerable Adults
6. Wire Fraud
7. Securities Fraud
8. Insurance Fraud
9. Accounting Fraud
10. Forgery
11. Conflict of Interest
12. Intentional Infliction of Emotional Abuse
13. Breach of Fiduciary Duty
14. Extortion
15. Tampering with Witnesses
16. Interference with an Inheritance
17. Tortious Interference with Economic Relations
18. Aiding and Abetting
19. Obstruction of Justice
20. Falsifying Court Documents
21. Conversion
22. Defamation of Character
23. Blackmail
24. Interference with Marital Relations
25. Unlawful Seizure of Property

**NOT ONE OF THESE ALLEGATIONS HAS BEEN CHALLENGED BY PLAINTIFFS.**

Despite the associated list of alleged crimes, the court refuses to not require the most basic item entitled to Defendant, statutory accounting. Instead, it permits a complaint such as the one herein which is unquestionable one more retaliatory act against victims whose only crime is to know the truth and demand assets unlawfully removed be returned to him. Plaintiff would ask the court exactly what it is it expects of him if not to fade silently into the night; homeless and destitute. What is the real purpose of the litigation herein if not to rob Plaintiff of precious time and money while being denied the right to the due process of law.

For years, simple threshold questions have remained unresolved. They have not remained unresolved because they are too complicated. They have remained unresolved because they are too dangerous. Defendant has repeatedly asked whether governing documents were followed, whether fiduciary duties were honored, whether amendments were validly executed, whether authority truly exists for those asserting control, and whether those who have accused him of fraud can state, with particularity, what the alleged fraud is. Yet those questions remain unanswered while Defendant's income has been cut off, his records withheld, his authority erased, and his family pushed toward financial collapse.

---

## I. THIS CASE HAS BECOME A TEST OF WHETHER POWERFUL INSTITUTIONS CAN EVADE THE LAW THROUGH DELAY, SILENCE, AND PROCEDURAL SHELTER

The public is told that courts exist to resolve disputes. Yet the record reflects something far more troubling: a prolonged pattern in which the decisive questions are never reached, the underlying documents are never squarely confronted, and the parties with money, counsel, institutional protection, and political insulation are permitted to continue acting as though their authority were settled while the party challenging them is forced to survive on fragments.

Defendant has described, in a detailed timeline (Exhibit A), a chronology beginning in 2013 and continuing through the present, involving estate planning, trust amendments, disputed transfers of authority, removals from fiduciary roles, denials of accounting, and later retaliation in both civil and personal form. The timeline describes, among other events, the introduction of Craig McCullough in 2013, the 2015 and 2016 trust structures, the December 8, 2017 governance

changes, the April 17, 2018 trust amendment, the February 11, 2019 conflict disclosure, the March 20, 2019 complaint, the May 21, 2019 removals, the 2024 vexatious-litigant order, and the March 6, 2026 cutoff of Defendant's income.

What matters here is not whether every allegation has already been adjudicated. They have not. That is the point. What matters is that the central issues have been persistently avoided while severe consequences have continued in real time. When a court system repeatedly avoids the underlying question of authority, while permitting one side to continue acting under disputed authority, that system ceases to function as a neutral referee and begins functioning as a shield.

## II. THE RECORD IS NOT ABOUT A MERE BUSINESS DISAGREEMENT. IT IS ABOUT WHETHER THE LAW APPLIES EQUALLY TO THOSE CLOSEST TO INSTITUTIONAL POWER

The law firm at the center of these events is not, according to Defendant's position, just any law firm. It is Kirton McConkie, a firm Defendant contends acts as legal arm and agent for the LDS Church and whose exposure would therefore create consequences far beyond a private malpractice dispute. Defendant's contention is that the extraordinary resistance to answering direct questions exists precisely because the truth, if exposed, would not stop with a few attorneys. It would extend upward into institutional liability, reputational collapse, and public scrutiny of how power has been exercised behind the veneer of legal formality.

Attorney Greg Moesinger in his role of concealing the crimes via thousands of pages of court filings is clearly manipulating the court and everyone involved to obey whatever motion he files. Within the case herein, he is not only counsel for four of the Plaintiffs, he himself is a Plaintiff in the related filing, a Defendant, and a beneficiary of proceeds being paid by defendant's own entities. And yet not one of the dozens of judges who have reviewed this case can seem to identify any conflict of interest.

Whether that larger contention is ultimately proven is for proper proceedings. But what cannot be ignored is that the pattern Defendant describes is entirely consistent with institutional preservation: deny hearings, deny accountings, avoid yes-or-no answers, force pro se exhaustion, weaponize

37

labels, and let economic pressure do what argument cannot. That is why this case matters beyond Eliason Eight, beyond one trust, beyond one family.

If the allegations are false, they can be disproven through documents, accounting, testimony, and direct answers. If the allegations are true, then what has occurred is staggering. If the allegations are serious enough that neither side should proceed without clarity, then continued silence is intolerable. The only position no court should be allowed to take is this one: that the questions are too dangerous to answer, but the retaliation may continue anyway.

## III. THE COURTS HAVE BEEN PRESENTED WITH SIMPLE QUESTIONS FOR YEARS, YET THE CONSEQUENCES HAVE FALLEN ONLY ON THE FAMILY ASKING THEM

Defendant's central grievance is not that he has lost every ruling. It is that the decisive questions have never been forced into the open. He asks whether the governing document dated December 8, 2017 controls the authority of Eliason Eight, LLC and whether later removals and replacements complied with it. The December 8, 2017 filings identify managers and state that the act of at least three managers is required for disbursements outside the ordinary course of business and for transfer-related acts affecting real property interests.

> 8    General Management of the Company   The business and affairs of the Company shall be managed by Managers   Except as set forth below relating to real property, the Managers are authorized to enter into any and all transactions on behalf of, or otherwise act for or bind, the Company   The authority of the Managers to bind the Company is not limited   Notwithstanding, and except as set forth below relating to real property, a majority vote of the Managers with each Manager getting one vote, shall control   If an even number of Persons are serving as Managers and such Managers are unable to take action or make a decision because of a disagreement or dispute, such decision may be made by a vote of Members owning a Super Majority (75%) Interest   The act of at least three (3) Managers is required to make any disbursements not incurred in the ordinary course of the Company's business

This was taken from the Amendment filed on December 8th, 2017 with the following listed managers; Brett L Eliason, Lisa Stephens, and Mark Eliason.

38

## QUESTION 1: MANAGER STATUS

Does the following Amended and Restated Certificate of Organization of Eliason Eight, LLC identify Brett L Eliason as one of the three managers?

☐ YES
☐ NO

**AMENDED AND RESTATED
CERTIFICATE OF ORGANIZATION
OF
ELIASON EIGHT, L.L.C.**

RECEIVED
DEC 0 8 2017
Utah Div. of Corp. & Comm. Co

The undersigned, acting as Managers of this Utah limited liability company (the "Company") under the Utah Revised Limited Liability Company Act (the "Act"), adopt the following Amended and Restated Articles of Organization for the Company:

1.  The name of the Company is **Eliason Eight, L.L.C.** The Articles of Organization for the Company were originally filed on April 2, 1970 as Entity No. 4994239-0160.

2.  The Principal Office Address of the Company is as follows:

    2183 East 3780 South
    Salt Lake City, Utah 84109

3.  The name and street address of the Company's registered agent are as follows:

    Lisa E. Stephens
    2183 East 3780 South
    Salt Lake City, Utah 84109

4.  The business and affairs of the Company shall be managed by Managers. The name and address of each Manager of the Company are as follows:

    Joyce S. Eliason
    4349 Lynne Lane
    Salt Lake City, Utah 84124

    Brett L. Eliason
    43 Fairview Way
    North Salt Lake, Utah 84054

    Mark D. Eliason
    3221 South Kenwood Street
    Salt Lake City, Utah 84106

DEC 8 '17 PM4:33

If the answer is yes and Brett L Eliason is named as one of the three surviving managers; every decision such as removing a manager or paying Kirton McConkie millions must be approved by him.

## SUBSEQUENT AMENDMENT (MANAGER REMOVAL)

Plaintiffs executed a subsequent amendment on November 23rd, 2020 removing and replacing Defendant, without approval, and ignoring the governing document dated December 8th, 2017.

RECEIVED

NOV 30 2020

Utah Div. of Corp. & Comm. Code

### AMENDMENT TO THE
### CERTIFICATE OF ORGANIZATION OF
### ELIASON EIGHT, L.L.C.

This Amendment to the Certificate of Organization of Eliason Eight, L.L.C. (the "Company") is made effective the 23rd day of November, 2020, by Mark Dean Eliason, Lisa Eliason Stephens and Jason P. Stephens, the Managers (the "Managers").

1.  The name of the Company is Eliason Eight, L.L.C. The Certificate of Organization for the Company was originally filed on October 11, 2001 as Entity No. 4994239-0160.

2.  Section 4 is hereby amended in total to read as follows:

4.  The business and affairs of the Company shall be managed by Managers. The name and address of each Manager of the Company are as follows:

Mark D. Eliason
3221 South Kenwood Street
Salt Lake City, Utah 84106

Lisa E. Stephens
2183 East 3780 South
Salt Lake City, Utah 84109

Jason P. Stephens
2183 East 3780 South
Salt Lake City, Utah 84109

3.  Except as amended above, the Certificate of Organization of Eliason Eight, L.L.C. is ratified.

4.  The effective date of this Amendment to the Certificate of Organization is the 23rd day of November, 2020 or, if later, the date this Amendment to the Certificate of Organization is filed with the Division of Corporations and Commercial Code of the Utah Department of Commerce.

State of Utah
Department of Commerce
Division of Corporations and Commercial Code
I hereby certified that the foregoing has been filed
and approved on this 23 day of Nov/20 20
in this office of this Division and hereby issued
This Certificate thereof.

NOV 20 '20 ~ 11:31

Examiner RDL  Date 12/01/20

**QUESTION 2:**

Is it Plaintiffs' position that the removal and replacement of Defendant as a Manager was **performed in compliance with the governing document dated December 8, 2017?**

☐ YES
☐ NO

## DEFENDANT'S FEBRUARY 6, 2026 AMENDMENT

Defendant filed an amendment on February 6, 2026, clarifying that the December 8, 2017 governing document remains controlling, as part of his fiduciary duty to protect the company's interests.

### AMENDMENT TO CERTIFICATE OF ORGANIZATION
### ELIASON EIGHT, L.L.C.

Pursuant to the Utah Revised Uniform Limited Liability Company Act and the records of the Utah Division of Corporations and Commercial Code, the undersigned hereby submits this Amendment to clarify and restate the governing authority applicable to Eliason Eight, L.L.C. (the "Company").

1. **Governing Amendment.**
   The Company's *Amended and Restated Certificate of Organization*, effective December 7, 2017 and received by the Utah Division of Corporations on December 8, 2017, constitutes the last duly authorized and properly executed amendment to the Company's governing documents (the "2017 Amendment").
2. **Execution Requirements.**
   The 2017 Amendment expressly provides that amendments to the Company's organizational and governing documents require execution and authorization by all Managers of the Company.
3. **Subsequent Filings.**
   Any filings or amendments submitted to the Division subsequent to December 7, 2017 that were not executed in accordance with the execution requirements set forth in the 2017 Amendment were not authorized pursuant to the Company's governing documents.
4. **Clarification of Record.**
   Accordingly, the Company hereby provides notice that the 2017 Amendment remains the controlling and operative governing document of Eliason Eight, L.L.C., and that any subsequent filings not properly authorized should not be relied upon as reflecting valid amendments to the Company's governance or ownership structure.
5. **No Other Changes.**
   Except as expressly stated herein, no other provisions of the Company's Certificate of Organization or governing documents are amended by this filing.

This Amendment is submitted solely for purposes of record clarification and administrative accuracy.

Executed on this 6th day of February, 2026.

FEB 6 '26 PM1:46

Brett L. Eliason
Manager, Eliason Eight, L.L.C.
Date:

## QUESTION 3:

Is it Plaintiffs' position that Defendant's February 6, 2026 filing constitutes **fraud**?

☐ YES
☐ NO

41

The following is a letter from Greg Moesinger as counsel in the same matter he is both a Plaintiff and a Defendant, using extortion and claiming that Defendant has committed fraud and a criminal investigation would be open, and all distributions halted.

## KIRTON | McCONKIE

Gregory S. Moesinger
36 S. State Street, Suite 1900 Salt
Lake City, UT 84111
gmoesinger@kmclaw.com
801-328-3600

March 6, 2026

**Via U.S. Mail**

Brett L. Eliason
634 Ridge Top Lane
North Salt Lake, Utah 84054

**Via Email**

Brett L. Eliason
brett.eliason1@gmail.com

RE:    Eliason Eight, LLC v. Brett L. Eliason

Dear Mr. Brett Eliason:

As you know, I represent Eliason Eight, LLC, a Utah limited liability company ("Eliason Eight"). I have received your email inquiries regarding upcoming payments or distributions from Eliason Eight to you, as a member. Your inquiries are not well-received.

Eliason Eight has just discovered that, on or about February 6, 2026, you submitted or filed with the Utah Department of Commerce, Division of Corporations, an unauthorized and false Amendment to Certificate of Organization as to Eliason Eight (the "False Amendment"), as well as an unauthorized and false Statement of Change of Registered Agent as to Eliason Eight (the "False Statement of Change"). I have enclosed those documents, as filed, for reference.

Moreover, we have discovered that you then proceeded to submit the False Amendment, False Statement of Change, and/or other documentation to companies or entities that are obligated to pay Eliason Eight periodic payments, with instructions for them to change the account contact information, notice address, and payment instructions, such that future payments would be made directly to you and/or your entity, instead of coming to Eliason Eight. We are aware that you have done this on at least three occasions, with respect to Kinder Morgan, Crescent Energy, and SM Energy. We are also aware of your contact with Finley Resources.

You have not only interfered with Eliason Eight's economic and contractual relations, and breached the operating agreement and other duties to the company, but you have also committed a fraud, attempted to divert and steal funds that belong to the company, as well as provided false documents to a government agency. You have caused significant damage to Eliason Eight. At least Kinder Morgan and Cresent Energy (and potentially others) have suspended the accounts because of your submissions, such that they are now withholding payments that would otherwise come due and payable to Eliason Eight because of the confusion. Your fraudulent conduct, wrongdoing, and malfeasance are wholly unacceptable.

Brett L. Eliason
Re: Eliason Eight, LLC
March 6, 2026

Page 2 of 2

First, demand is hereby made that you immediately withdraw the False Amendment and False Statement of Change from the Utah Department of Commerce.

Second, demand is hereby made that you immediately withdraw, revoke, or otherwise rescind any of your correspondence or submissions to any vendor or obligor of Eliason Eight, including to Crescent Energy, SM Energy, Finley Resources, and Kinder Morgan, to decrease your interference and to help alleviate the situation that you have caused. You must also provide the names of all the companies or entities that you contacted, so that Eliason Eight may properly address the issue with them to mitigate the damages or losses.

Third, where Eliason Eight is just learning of your fraud and is only beginning to conduct its investigation into this matter, Eliason Eight will not make additional distributions to you until this has been fully investigated, its damages ascertained, and your misconduct remedied. Among other relief and recourse, Eliason Eight will exercise its right of offset (or setoff) of its damages and losses against any amounts that would otherwise come due to you or any assignee. This includes, but is not limited to, all of Eliason Eight's attorneys' fees and costs, added administrative fees, and accounting fees, incurred as a result of your actions. Eliason Eight also reserves its rights to file a lawsuit against you, including for declaratory relief, punitive or exemplary damages, forced sale, and/or the forfeiture of your membership.

Fourth, your conduct is criminal and violates state and likely federal laws (having crossed state lines). At a minimum, it appears that you have engaged in fraud, theft or attempted theft, and provided false information to a government agency under Utah Code § 76-8-506. As part of its investigation, Eliason Eight intends to refer your fraudulent and criminal conduct to the police and/or other authorities for prosecution.

Your cooperation in correcting your false submissions may help curtail Eliason Eight's damages and injuries, for which you are ultimately responsible. Govern yourself accordingly.

Very truly yours,

KIRTON McCONKIE

Gregory S. Moesinger

# QUESTION 3: CO-SETTLOR STATUS

Is it the Court's opinion that the above letter issued by Plaintiff/Defendant/Counsel/Beneficiary does not demonstrate extortion and blackmail, and intended to strip victim of his last asset and only source of income?

☐ YES
☐ NO

If the answer is no, then it follows common logic that Defendant's income be reinstated immediately without delay. If the answer is yes, the reason must be justified in writing.

Defendant has asked whether the March 6, 2026 accusation of "fraud," "attempted theft," and false filings can be stated with specificity, including the exact act, damages, and identity of the claimed investigation. In that letter, counsel for Eliason Eight accused Defendant of fraud, attempted diversion of funds, interference with company payments, and criminal conduct, while also stating that distributions would not be made until the matter was "fully investigated" and damages ascertained.

He also has asked whether his February 6, 2026 filing was in fact a fraudulent filing or instead a clarification asserting that the December 8, 2017 amendment remained the last duly authorized governing document. That filing expressly stated it was submitted to "clarify and restate the governing authority" and declared that the 2017 amendment remained the controlling document.

He has asked whether the Joyce S. Eliason Trust dated October 28, 2015 names Brett as a child-beneficiary class member and whether Max D. Eliason appears as co-trustee and spouse. The trust names Max D. Eliason as the Settlor's spouse, lists Brett Lynn Eliason among the Settlor's children, and identifies Joyce and Max as the original trustees. It also states that as to community property, the trust may not be amended without the mutual written consent of both the Settlor and the Settlor's spouse.

He has asked whether the Second Amendment of April 17, 2018 was executed by Max D. Eliason or whether his name even appears on the signature page. The Second Amendment, as provided, is made by "Joyce S. Eliason, the Settlor and Trustee," and the signature page shows Joyce alone as "Settlor and Trustee." It also rewrites trustee succession so that Lisa Eliason Stephens is next in line after Joyce. This has been identified by attorney Geroge Burbidge at Christensen Jensen as "jail time for Craig McCulloug," and yet the State of Utah and the Department of Justice cannot seem to see this as a criminal action.

He has asked for beneficiary statements and accounting for years. The Joyce trust itself states that an individual trustee shall render an annual accounting if requested by at least one beneficiary and that the accounting shall be rendered to beneficiaries who are then permissible distributees. None of these are outlandish questions. They are basic questions. Governance questions. Fiduciary questions. Yet, what has followed these questions has not been answers. It has been escalation.

44

## V. THE HARM IS NOT ABSTRACT. IT IS DOMESTIC, FINANCIAL, PHYSICAL, AND DEEPLY HUMAN

The consequences are not sterile litigation entries. They are the disassembly of a life. The timeline describes the collapse of Defendant's company, repossession of vehicles, foreclosure events, hard-money borrowing, eviction from the home his mother purchased, psychiatric hospitalization, exclusion from his father, and the termination of the final income stream tied to Eliason Eight. And not one of these allegations has ever been challenged or denied.

The March 6, 2026 letter did not merely accuse. It announced leverage. It stated that Eliason Eight would not make additional distributions while it investigated, would offset claimed damages, and reserved rights to more litigation and even forced sale or forfeiture of membership. That is not just paper. It is the removal of food, transportation, shelter, insurance, and stability from a family while the underlying authority to do so remains contested.

When courts leave those threshold questions unresolved, they are not preserving neutrality. They are permitting one side to continue wielding disputed power while the other side bleeds. That is why this filing is broader than who controls Eliason Eight. Because the issue is no longer merely control. The issue is whether the judicial system will permit disputed control to be used as an instrument of private punishment while refusing to decide whether that control is legitimate in the first place.

---

## V. THE "VEXATIOUS" LABEL HAS BECOME A SUBSTITUTE FOR ANSWERING THE QUESTIONS

Defendant's position is that the March 11, 2024 vexatious-litigant order did not solve any substantive issue. It merely handed the opposing side and the courts a permanent procedural phrase to avoid confronting the merits. His timeline states that after Judge Kara Petit labeled him vexatious, other cases were closed and the label became the response used to avoid yes-or-no questions surrounding conflicts, accountings, and authority.

If that characterization is inaccurate, the cure is simple: answer the questions.

45

If it is accurate, then the label has become something far more troubling than a case-management tool. It has become a mechanism by which a citizen may be denied the substance of law while still being subjected to its force. A court may regulate abuse of process. It may not use a label as a substitute for due process itself.

No court should be comfortable with a record in which the same response repeats for years while the estate is never accounted for, the trustees never fully answer, the governance documents are never squarely tested, and the family asking for accountability is steadily stripped of home, business, money, and voice.

---

## VI. THE MOST DISTURBING FEATURE OF THIS RECORD IS NOT ANY SINGLE ALLEGATION. IT IS THE APPARENT WILLINGNESS OF THE SYSTEM TO LET THE ALLEGATIONS ROT IN PLACE WHILE PUNISHING THE PERSON RAISING THEM

There are allegations in Defendant's timeline that are grave, including allegations surrounding coercive trust amendments, undisclosed conflicts, elder exploitation, misuse of fiduciary authority, false allegations to authorities, wrongful deprivation of access to his father, and medical issues surrounding Joyce Eliason's final weeks. Defendant's timeline references alleged morphine issues, hospital records, and disputed amendments made in April and May 2018.

This Notice does not ask the Court to endorse each allegation as proven fact today. It asks the Court to confront the intolerable reality that allegations of this gravity have been met not with transparent adjudication, but with procedural burial, non-response, and retaliation. A functioning judiciary does not protect itself by refusing to look.

It protects itself by looking straight at the hardest facts first. Because if the allegations are exaggerated, sunlight cures them. If the allegations are false, sworn answers and evidence dispose of them. If the allegations are true, then delay is not neutrality. Delay is participation. That is the point from which the public recoils. Not merely that bad acts may have occurred. But that repeated pleas for adjudication were met with inertia while the cost was borne entirely by the alleged victims. That is how public faith dies.

Not in one spectacular act, but in years of watched suffering, unanswered questions, and the unmistakable appearance that some institutions are too important to be inconvenienced by the truth.

---

## VII. IF THE CORE EMBEZZLEMENT ALLEGATIONS ARE TRUE, THE SCALE WOULD BE ASTRONOMICAL. THAT IS EXACTLY WHY THE QUESTIONS ARE NOT BEING ANSWERED.

Defendant has asserted for years that the estate and trust-related assets involved are enormous and that the disappearance, transfer, and non-accounting of those assets would place the matter in a category of extraordinary misconduct if proven. His timeline characterizes the issue as potentially involving hundreds of millions of dollars and one of the largest fiduciary abuses imaginable.

Reasonable people may disagree with his estimates. But no reasonable court should read such allegations, coupled with years of no accounting, no transparent hearing on the merits, and direct accusations of fraud now being used to cut off his income, and conclude that the proper response is still delay. The larger the allegations, the more necessary the answers become. The larger the potential institutional exposure, the more dangerous silence becomes. Because once the public concludes that courts will not force answers where religion, political influence, or elite counsel are involved, then democracy itself begins to look ornamental. The message becomes unmistakable: the rules are for the weak, and the powerful will be protected until exposure becomes impossible to contain. That is not merely a family tragedy. That is civic damage.

---

## VIII. THIS COURT MUST UNDERSTAND WHAT IT LOOKS LIKE FROM THE OUTSIDE

From the outside, the picture is devastating.

A son asks for accounting. He is called vexatious.
A beneficiary asks for documents. He gets silence.
A family asks to keep its home. The system watches the eviction.
A son asks to see his dying father. Access is withheld.
A litigant asks direct yes-or-no questions. No one answers.
Then the same people accusing him of fraud cut off the income his family needs to survive.

47

And the courts still have not forced the basic questions to be answered.

That is not how justice looks to the public.
That is how protection looks.
That is how capture looks.
That is how an institution behaves when it believes exposure is more dangerous than continued harm.

Defendant's timeline captures the cumulative effect plainly: he has been stripped of income, excluded from governance, denied records, accused of fraud, and left with no adjudicated answer to the authority question at the center of everything. If the public saw only one or two filings, it might look like obsession. If the public sees the whole chronology, it looks like a man screaming that his house is on fire while every agency with a hose debate whether he has filed too many complaints.

## IX. THE COURT CAN NO LONGER PRETEND THIS IS JUST A CASE OF DEFAMATION

The easy path is to reduce all of this to tone, to books, to filings, to personality, to "family dysfunction," to "overheated allegations," to "case management." But the March 6, 2026 letter alone proves that this is not a sealed historical quarrel. Counsel for Eliason Eight accused Defendant of fraud and criminal conduct and announced that his distributions would be withheld while they investigated and calculated damages. That is present-tense force. The December 8, 2017 governance documents remain central because they define whether later acts were authorized at all. Those documents show specific manager structure and multi-manager requirements for certain acts.

The 2015 trust and 2018 amendments remain central because they define whether succession and fiduciary authority were altered lawfully or not. The original trust names Joyce and Max as trustees, lists Max as spouse, includes Brett among the children, and contains mutual-consent language for community-property amendments. The later amendment appears to place Lisa Stephens next in line and is executed only by Joyce. Those are not side stories. They are the engine room of the case. If the Court avoids them, the Court avoids the case.

## X. REQUEST FOR SPECIFIC CLARIFICATIONS (YES / NO)

Defendant respectfully moves the Court for an order compelling Plaintiffs to clarify their positions regarding the terms, of Trust documents and Amendments relating to the estate planning process of Max and Joyce Eliason. The questions are simplified, but their consequences devastating which is exactly why they are considered "vexatious."

Central to this case is a documented and admitted undisclosed conflict of interest, in which Defendants simultaneously purported to represent the settlors—Max and Joyce Eliason—while in fact representing a beneficiary whose interests were directly adverse. Below is Article 8.13 of the Joyce S. Eliason Trust dated October 28th, 2015 clearly identifying Craig McCullough and Kirton McConkie as the Settlors Counsel:

> 8.13 Notification of Attorney. If the Settlor has a serious illness or operation, the Settlor requests that the Trustees contact his attorney, Craig F. McCullough, KIRTON MCCONKIE, 50 East South Temple, suite 400, Salt Lake City, Utah 84111, (801) 328-3600, to obtain instructions in case the Settlor should die. If death makes this prior conversation impossible, then the Trustees should call said attorney as soon after death as possible.

> ### ARTICLE 9
> ### FORFEITURE

> If any beneficiary under this Trust, and any trusts herein created, or intended to be created, shall contest in any court, without probable cause, any provision of this trust agreement, the Trustee shall distribute such beneficiary's share of any distribution as if such beneficiary had predeceased the Settlor.

> IN WITNESS WHEREOF, the Settlor and Trustees have executed this trust agreement.

> Max D. Eliason,                                    Max Eliason
> Settlor and Co-Trustee

> Joyce S. Eliason,
> Co-Trustee

## QUESTION 4:

Is it the position of the court that the afore Section 8.13 of the Joyce S Eliason Trust state clearly that Craig McCullough represents Max and Joyce Eliason?

☐ YES
☐ NO

49

## ADMISSION OF REPRESENTATION AND UNDISCLOSED CONFLICT OF INTEREST

On February 23, 2019, attorney Thomas A. Mecham of Kirton McConkie confirmed in writing the scope of representation undertaken by the firm in connection with the estate of Joyce S. Eliason. In his email correspondence, Mr. Mecham expressly stated: "Craig McCullough of our office informed you that our firm represents your sister, Lisa Stephens, in her capacity as personal representative of your mother's estate and trustee of her trust."

**Thomas A. Mecham** <tmecham@kmclaw.com>               Sat, Feb 23, 2019, 3:00 PM   ☆         ⋮
to George, Craig, me ▾

Dear Brett,

Thank you for your message. In our last (and only) meeting, I explained to you that we do not represent you and encouraged you to retain your own legal counsel, as the concerns you raised in our conversation clearly may affect your legal rights.

Following our meeting, Craig McCullough of our office informed you that our firm represents your sister, Lisa Stephens, in her capacity as personal representative of your mother's estate and trustee of her trust. Craig also sent you copies of Joyce's will and trust.

I am grateful to see that you have reached out to Mr. Burbidge. You will want to provide him with copies of the documents Craig recently sent to you. Once he has been engaged, I anticipate that Mr. Burbidge will reach out to Craig if he believes the issues you have raised have merit and should be brought to Lisa's attention. Of course, you may also reach out to Lisa directly.

Until you take these steps, however, there is nothing I can do for you, and there is no further reason to communicate with me or others occupying managerial roles within Kirton McConkie. Craig and Kirton McConkie represents Lisa. If you do not like something Lisa has done, the best person to consult is Lisa or Craig. Neither I nor anyone else at this firm (except for Craig) has any substantive knowledge regarding your mother's trust or estate. In other words, Craig will respond on behalf of, and has authority to speak for, Kirton McConkie.

The sense I get from your letter is that you are very concerned about this matter and that you are searching for anyone (including me) who might help you. I cannot help you because Craig and this firm has been hired to help your sister. You need to hire an attorney who is working on your behalf. This firm will respond to you or your attorney's concerns only through Craig. I cannot put it more simply than that.

I wish you all the best.

This statement constitutes a direct admission that Kirton McConkie was acting as legal counsel for Lisa Stephens in fiduciary roles tied to the estate and trust. However, this admission cannot be reconciled with the governing estate documents or with fundamental principles of fiduciary and trust law. The original trust instruments and last wills and testaments of Max D. Eliason and Joyce S. Eliason, both dated October 28, 2015, clearly establish that:

- Max D. Eliason was the **successor Trustee** upon the death of Joyce S. Eliason
- Brett L. Eliason and Max D. Eliason were named as **personal representatives**
- The trust explicitly identifies Kirton McConkie as attorneys to be contacted by the Trustees, meaning their role was to advise the Settlors and the duly appointed fiduciaries—not to supplant them

At the time of this email, Max D. Eliason was alive and had never lawfully relinquished his role as Trustee. No valid amendment existed that complied with the trust's execution requirements to remove him. Likewise, no lawful probate process had displaced him as a personal representative. Thus, Kirton McConkie's representation of Lisa Stephens in these fiduciary capacities necessarily required one of two conclusions:

- Either Max D. Eliason had been lawfully removed and replaced in accordance with the governing documents and applicable law; or
- Kirton McConkie knowingly disregarded the trust structure and assisted a beneficiary in assuming control without legal authority

**The documentary record establishes the latter.**

This conflict is further amplified by the firm's own internal contradiction. The trust provisions explicitly direct that Kirton McConkie serve as legal counsel to the Settlors and Trustees in administering the estate. Yet, in practice, the firm:

- Refused to communicate with Brett L. Eliason
- Denied representing him or his father
- Directed him to obtain separate counsel
- Instructed that all communications must go through Craig McCullough, who was simultaneously acting on behalf of Lisa Stephens

This creates a critical and unavoidable inference: If Kirton McConkie were truly representing Lisa Stephens **solely in her fiduciary capacity as Trustee or Personal Representative**, then their duties would run to the trust and estate as a whole, including all beneficiaries and co-fiduciaries. Under such circumstances, there would be no basis to exclude a co-equal beneficiary or named fiduciary from communication or require them to retain separate counsel merely to receive information about the administration of the trust.

However, Mr. Mecham's directive that Brett L. Eliason must obtain independent counsel—and that the firm would communicate only through Craig McCullough—demonstrates that Kirton McConkie was, in reality, representing Lisa Stephens in her **individual capacity as a beneficiary whose interests were adverse to other beneficiaries and fiduciaries**. This constitutes an undisclosed conflict of interest.

Under **Utah Rules of Professional Conduct Rule 1.7**, a lawyer shall not represent a client if the representation involves a concurrent conflict of interest, including where:

- The representation of one client will be directly adverse to another client; or
- There is a significant risk that the representation will be materially limited by responsibilities to another client

Further, under **Rule 1.13 (Organization as Client)** and well-established fiduciary principles, counsel representing a trust or estate must act in the best interests of the entity and its beneficiaries as a whole—not favor one beneficiary to the detriment of others.

Here, Kirton McConkie undertook representation that was:

- Adverse to the rightful Trustee (Max D. Eliason)
- Adverse to a named personal representative and beneficiary (Brett L. Eliason)
- Beneficial to a single individual (Lisa Stephens), whose authority itself is derived from disputed and invalid documents

The conflict was never disclosed, never waived, and never adjudicated. Instead, the firm now characterizes allegations of conflict as unfounded, despite their own written admission confirming the exact structure of representation that gives rise to the conflict. This leads to the same unavoidable legal conclusion presented throughout this Complaint:

52

- **If Kirton McConkie represented the trust and estate, then their exclusion of rightful fiduciaries and beneficiaries constitutes a breach of fiduciary duty and professional misconduct.**
- **If Kirton McConkie represented Lisa Stephens individually, then their actions in assisting her to assume control over the trust and estate constitute participation in a scheme to deprive other beneficiaries of their rights and interests.**

Either scenario establishes liability, and there is no lawful interpretation under which these actions are permissible. **This case is, at its core, remarkably simple.** It does not require complex legal analysis, prolonged discovery, or competing expert testimony. It turns on a single, fundamental question—one that Defendants have avoided for years, and one that no court has required them to answer:

## QUESTION 5:

**Do Defendants, including Kirton McConkie, claim to represent the interests of the Settlors, Max and Joyce Eliason, and the trusts created for the benefit of their heirs, while simultaneously representing and favoring one beneficiary to the exclusion of others?**

YES ☐      NO ☐

This is not a rhetorical question. It is a legal one. Because under well-established principles of fiduciary and trust law, the answer determines everything. This is what the principal of "Res Ipsa Loquitur" was designed for.

## The Legal Consequence of the Answer

**If the answer is yes,** then Defendants have admitted to an **undisclosed conflict of interest** (which they already have, but this supports it. Such a conflict is not a minor procedural defect. It is a fundamental breach of fiduciary duty that strikes at the heart of the attorney-client and trustee-beneficiary relationships. Under longstanding legal principles, including the **Restatement (Third) of Trusts** and governing fiduciary law:

- A fiduciary must act impartially among beneficiaries;
- An attorney cannot represent adverse interests without full disclosure and informed consent;
- Transactions arising from undisclosed conflicts are **voidable** and subject to rescission;

In such circumstances, the law requires that the parties be restored to the position they would have occupied: **as if the conflicted relationship had never occurred.**

This includes:

- unwinding transactions;
- restoring control of assets;
- imposing constructive trusts where necessary;

**If the answer is no,** then Defendants face a different but equally fatal consequence. Because the documentary evidence—including trust instruments and related filings—demonstrates that Defendants have repeatedly asserted authority over the trusts and estates of Max and Joyce Eliason. If Defendants now deny such representation, then they must explain:

- by what authority they controlled trust and estate assets;
- by what authority they excluded Plaintiffs;
- by what authority they withheld accounting and distributions;

Either position leads to liability.

THERE IS NO THIRD OPTION.

Notwithstanding the procedural posture of this case and any briefing schedules that may permit a twenty-one (21) day response period, the Court should recognize that Plaintiffs' injuries are not theoretical or prospective—they are ongoing and severe. Even assuming, arguendo, that Defendants attempt to justify delays based upon unresolved questions regarding certain asset classes, including oil and gas distributions, no legitimate explanation exists for the complete deprivation of Plaintiff Brett L. Eliason's inheritance.

Plaintiff's mother passed away in May of 2018, at which time her estate assets were distributed. Yet, to date, Plaintiff has not received nor been provided an accounting for a single dollar of those distributions. Following the death of Plaintiff's father in October of 2024, the same pattern has continued—no distributions, no accounting, and no justification. At no time have Defendants disputed that Plaintiff is a lawful heir and beneficiary. Accordingly, the continued withholding of all distributions, coupled with the complete absence of accounting, cannot be attributed to

legitimate estate administration. Rather, it reflects a deliberate and ongoing deprivation of Plaintiff's property rights.

The law does not permit a beneficiary to be indefinitely excluded from his inheritance under the guise of litigation, particularly where no findings of wrongdoing have been made and no lawful basis for withholding distributions has ever been articulated. Whether the Department of Justice elects to investigate or prosecute the conduct described herein, including alleged violations of federal RICO statutes, is a matter within its discretion. That issue, however, is not the primary focus of this action.

What is both striking and deeply troubling is the continued refusal of the judicial system to intervene in the face of clear and ongoing harm to Plaintiffs, and to require Defendants—including Kirton McConkie and affiliated entities—to perform the most basic legal obligation owed under trust and fiduciary law: to account for the estate they were engaged to protect.

The record reflects not only the absence of such accounting, but the systematic removal and control of assets through a network of trusts and related entities, coupled with years of retaliatory conduct directed at Plaintiffs. This Court is not being asked to resolve every allegation of wrongdoing, but rather to enforce the rule of law by requiring transparency, restoring accountability, and halting conduct that, if left unchecked, undermines the very foundation of fiduciary responsibility.

## QUESTION 6:

**Is it the court's opinion that Kirton McConkie and Craig McCullough have no conflict of interest despite Tom Mecham admitting to such in the afore mentioned email?**

YES ☐      NO ☐

# THE JOYCE S ELIASON TRUST DATED OCTOBER 28, 2015

Below is the first page of the Joyce S Eliason Trust dated October 28th, 2015 prepared by Craig McCullough of Kirton McConkie who were representing Lisa Stephens as the beneficiary at the time this was created.

## THE JOYCE S. ELIASON TRUST

This trust agreement is made and entered into this          day of _OCTOBER_         , 2015, by and between Joyce S. Eliason (the "Settlor"), of Salt Lake County, State of Utah, and Joyce S. Eliasomqnd Max D. Eliason (the "Trustee" or "Trustees").

The name of this Trust shall be The Joyce S. Eliason Trust (the "Trust").

Joyce S. bliason hereby transfers and delivers to the Trustees the property listed in the attached Schedules "A" and "B". The Trustees agree to hold this property and any other property which may be trånsferred to this Trust by either inter vivos or testamentmy transfer as part of the Trust. The Trustees agree to hold, administer and distribute all of the Trust's property according to the terms and        Conditions stated in this trust agreement.

### ARTICLE I
### FAMILY AND TRUST PURPOSE

1.1      Family. The family of the Settlor consists of the following:

IE;I .I Spouse of the Settlor :

Max D. Eliason

1.2 Children of the Settlor:

| NAMES | BIRTH DATES |
|---|---|
| Mark Dean Eliason | March 27, 1960 |
| lisa Eliason Stephens | January 9, 1962 |
| Brett Lynn Eliason | January 19, 1965 |

In this t%st agreement, the words "Settlor's children" refer to such children. The Trustees may rely upon these birth dates for all purposes.

1.2 Purpose of the Trust. The Settlor establishes this Trust for the primary benefit of the Settlor duriiåg the Settlor's lifetime, for the Settlor's surviving spouse, and for the Settlor's children and latér descendants thereafter.

## QUESTION 7: BENEFICIARY STATUS

Is Brett L. Eliason named as a beneficiary under the Trust dated October 28, 2015, and if so, is he entitled to accounting and beneficiary statements?

☐ YES
☐ NO

56

Below is the signature page of the Max and Joyce Eliason trust dated 10-28-15.

8.10 <u>Age</u>. A person attains a specific age (for example age twenty-one (21)) at the beginning of the day that begins the person's next year of life (for example the beginning of the person's twenty second (22nd) year of life). Any person whose birthday falls on February 29 shall be deemed to have a birthday on February 28 for all purposes of this Trust.

8.11 <u>Number and Gender</u>. The singular shall be interpreted as the plural and vice versa, if such treatment is necessary to interpret this Trust in accordance with the manifest intent of the Settlor Likewise, if either the feminine, masculine, or neuter gender should be one of the other genders, it shall be so treated. The term "Trustee" is used in the neuter singular throughout this trust agreement and applies to an individual trustee and to co-trustees.

8.12 <u>Paragraph Headings</u>. The paragraph and other headings are used for convenience and shall not be used in the interpretation of this trust agreement.

8.13 <u>Notification of Attorney</u>. If the Settlor has a serious illness or operation, the Settlor requests that the Trustees contact his attorney, Craig F. McCullough, KIRTON MCCONKIE, 50 East South Temple, suite 400, Salt Lake City, Utah 84111, (801) 328-3600, to obtain instructions in case the Settlor should die. If death makes this prior conversation impossible, then the Trustees should call said attorney as soon after death as possible.

ARTICLE 9
FORFEITURE

If any beneficiary under this Trust, and any trusts herein created, or intended to be created, shall contest in any court, without probable cause, any provision of this trust agreement, the Trustee shall distribute such beneficiary's share of any distribution as if such beneficiary had predeceased the Settlor.

IN WITNESS WHEREOF, the Settlor and Trustees have executed this trust agreement.

Max D. Eliason,                                    Max Eliason
Settlor and Co-Trustee

Joyce S. Eliason,
Co-Trustee

## QUESTION 8: CO-SETTLOR STATUS

Did Max D. Eliason execute the Trust dated October 28, 2015 as a Settlor and Co-Trustee?

☐ YES
☐ NO

57

Below is Section 6.1 taken from the Trustee Provisions of the Max and Joyce Eliason Trust dated October 18th, 2015 showing Max D Eliason as Successor Trustee.



48 8-7415-5034.1

## ARTICLE 6
## TRUSTEE PROVISIONS

6.1 Trustee Succession. The following will act as original Trustees, and as successor Trustees in the following order of succession:

(1) Joyce S. Eliason and Max D. Eliason. If either should cease or fail to serve, the survivor shall serve alone.

(2) Mark Dean Eliason, Lisa Eliason Stephens and Brett Lynn Eliason. If a Trustees should cease or fail to serve, the survivor(s) shall continue to serve.

(3) A Trustee chosen by the majority of the beneficiaries voting by right of representation as defined in Section 8.8.6, with the natural or legal guardian voting for legally disabled beneficiaries.

If a        Trus$ee fails to accept trusteeship or after becoming Trustee fails or ceases to serve as Trustee for any reason, including disability; then the next listed Trustee shall automatically be appointed to serve as Trustee. In the discretion of the Trustee, additional Trustees may be added in the successi0!1 above indicated if more than the number of Trustees then serving is desired. If an institutional .trustee is appointed Trustee, then no successor Trustee to said institution need be appointed. A Trustee will be deemed to be disabled if the Trustee's physician writes a letter to the successor Trustee informing the successor Trustee that in the physician's opinion the Trustee is disabled.

Notwitlistanding the foregoing, after the death of the Settlor and the Settlor's spouse, each of the Settlor's children may upon his or her request therefore, serve as the sole Trustee of any trust establisheq for that child pursuant to the terms and conditions of Section 5.2.1.

Funherönotwithstanding the foregoing, after the death of the Settlor and the Settlor's spouse, each o%he Settlor's Primary Descendants after they reach the age of 35, may upon his or her request therefore, serve as the sole Trustee of any trust established for that Primary Descendant pursuant to the terms and conditions of Section 5.2.2.

A child's or Primary Descendant's right to become a Tntstee is a personal right and such right may not be voluntarily or involuntarily transferred by or to any other person.

c

## QUESTION 9: SUCCESSOR TRUSTEE STATUS

Is Max D Eliason named as the Successor Trustee in the above referenced document?

☐ YES
☐ NO

58

Below is the revised Second Amendment dated April 17th, 2018 executed by Joyce Eliason with Max D Eliason being removed as both Settlor and Successor Trustee:

3.    Section 6.1 entitled "Trustee Succession" of the Trust is hereby amended in its entirety to read as follows:

6.1    Trustee Succession. The following will act as original Trustees, and as successor Trustees, in the following order of succession:

1.    Joyce S. Eliason.

2.    Lisa Eliason Stephens.

3.    A Trustee chosen by each of Settlor's descendants who are over the age of 25 and are not legally disabled, voting by right of representation as defined in Section 8.8.6, so there is one Trustee serving from each family line, who shall serve jointly. If all of the descendants of a Settlor's child are under age 25, the then serving Trustees of the Trust shall select a Trustee to represent that family line until a descendant reaches age 25.

6.7    Dissent Among Trustees. When more than one Trustee is serving, the unanimous consent of all of the then serving Trustees, whether individual or corporate, shall be required to make any decision, undertake any action, or execute any document affecting the Trust.

5.    Except as specifically herein amended, The Joyce S. Eliason Trust dated October 28, 2015 is hereby ratified and confirmed.

IN WITNESS WHEREOF the Settlor and Trustee has executed this Second Amendment to The Joyce S. Eliason Trust the day and year first above written.

SETTLOR AND TRUSTEE:



Joyce S. Eliason

STATE OF UTAH            )
                         : ss.
COUNTY OF SALT LAKE      )

On this 17 day of April, 2018, before me, Debra L. Demke, a Notary Public, personally appeared Joyce S. Eliason, the Settlor and Trustee, known to me or proved on the basis of satisfactory evidence to be the person whose name is subscribed to in the foregoing Second Amendment to The Joyce S. Eliason Trust, and acknowledged she executed the same.

DEBRA L. DEMKE
Notary Public
State of Utah
Comm. No. 679033
My Comm. Expires Aug. 29, 2018

Notary Public
Residing in Salt Lake County, Utah

## QUESTION 10: FRAUDULENT REMOVAL OF MAX D ELIASON

Is it legal for Craig McCullough to removed Max Eliason as Settlor and Successor Trustee without his "client's" approval?

☐ YES
☐ NO

Below is an electronic Waiver of Notice and Renunciation of Right to Serve as Personal Representative executed by Craig McCullough with "permission" from Max D Eliason. This while Craig McCullough did not represent Max Eliason while claiming Max had Alzheimer's Disease.

Craig F. McCullough, USB No. 2166
KIRTON MCCONKIE
50 East South Temple, Suite 400
Salt Lake City, Utah 84111
(801) 323-5938
cmccullough@kmclaw.com
*Attorneys for Applicant*

IN THE THIRD JUDICIAL DISTRICT COURT
IN AND FOR SALT LAKE COUNTY, STATE OF UTAH

| IN THE MATTER OF THE ESTATE OF<br><br>JOYCE STILLMAN ELIASON,<br>AKA JOYCE S. ELIASON,<br><br>Deceased. | **WAIVER OF NOTICE AND RENUNCIATION OF RIGHT TO SERVE AS PERSONAL REPRESENTATIVE**<br><br>Probate No. 183901323<br>Judge Elizabeth A. Hruby-Mills |
| --- | --- |

1.  With regard to the above estate, the undersigned is an interested person.

2.  The undersigned hereby waives notice of all petitions, applications, and filings concerning the above estate.

3.  The undersigned renounces any and all right that the undersigned has to serve as personal representative, and consents to the appointment of Lisa Eliason Stephens as personal representative.

DATED: June 18, 2018

/s/ Max D. Eliason

Max D. Eliason
*Signed by Craig F. McCullough with permission of Max D. Eliason*
4349 Lynne Lane
Salt Lake City, Utah 84124
(801) 277-5677

## QUESTION 10: FORGERY

According to the court, does this represent abuse and exploitation of Max D Eliason?

☐ YES
☐ NO

If the answer is yes, should Craig McCullough be in prison; if no, why not?

☐ YES
☐ NO

## X. THE COURT IS NOW ON NOTICE THAT FURTHER DELAY CARRIES ITS OWN CONSEQUENCES

This filing exists so that there can be no future claim that the ongoing harm was somehow invisible, hypothetical, or insufficiently explained.

The Court is on notice that Defendant contends:

- the key authority questions remain unresolved;
- the fiduciary accounting issues remain unresolved;
- the fraud allegations made against him remain undefined;
- his family is suffering immediate and escalating financial harm;
- and the continuing refusal to force direct answers is producing the appearance, and perhaps the reality, of institutional protection at the expense of lawful process.

If the Court acts, then the process can begin to recover legitimacy. If the Court does not act, then the record will reflect that while a family said its home, income, and survival were being destroyed in real time, the judicial system still declined to force basic answers to basic questions. That is no longer a private embarrassment. That is a public indictment.

## XI. CONCLUSION

Plaintiffs have made serious allegations of fraud and criminal conduct. They must now either: substantiate those claims or withdraw them. They cannot do neither.  This case has reached a point where the Court's intervention is no longer a matter of ordinary case management—it is necessary to prevent ongoing and compounding harm.

Defendant Brett L. Eliason stands in a position no litigant should occupy:

- stripped of income from a company in which he is a documented member and former manager;
- excluded from governance under disputed and unproven authority;
- denied access to financial records; and
- accused of fraud for actions taken to enforce compliance with the Company's governing documents.
- Refused statutory accounting and beneficiary statements for over a decade.

At the same time, the parties asserting control over Eliason Eight, LLC have:

- refused to produce documentation establishing their authority;
- continued to exercise unilateral control over company funds; and
- conditioned Defendant's financial survival on his submission to their demands.

This is not a hypothetical harm. This is not a future risk. This is a **present and ongoing deprivation of rights and resources**, occurring in real time while this matter remains pending before the Court. What makes this moment particularly significant is that the central issue is not complex: **Who has lawful authority to control Eliason Eight, LLC?**

That question is governed not by speculation or accusation, but by written documents already before the Court. The December 8, 2017 governing instrument establishes specific requirements for management authority and decision-making. Those requirements are not optional. They define the legitimacy of every subsequent action taken in the name of the Company.

This case is not a question of whether Kirton McConkie and Craig McCullough are guilty of dozens of crimes identified under RICO and Racketeering, but rather if justice for victims is possible in such a world strangled by corruption.

# EXHIBIT C

**Timeline of major events relating to the estate planning process of Max and Joyce Eliason from May 2013 - Present**